Minute Order Form (06/97)

# United States District Court, Northern District of Illinois



| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4928 - (MDL 1403) | **DATE** | 7/11/2002 |
| **CASE TITLE** | Marvin Kramer et al. Vs. Aventis CropScience etc. et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Memorandum Opinion and Order

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. Defendants' motion to dismiss is granted with respect to the claims for conversion and violations of the NCUTPA. The motion is denied with respect to the claims for negligence per se, public nuisance, private nuisance and violations of the TCPA. The negligence and strict liability claims are dismissed to the extent they rely on a failure to warn, but may proceed under the theories outlined above.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | **number of notices** | **Document Number** |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | | JUL 1 2 2002 | |
| | Notified counsel by telephone. | | | date docketed | 50 |
| ✓ | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | date mailed notice | |
| WAH | courtroom deputy's initials | | CLERK, U.S. DISTRICT COURT  02 JUL 12 PM 3:19  Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE StarLink CORN PRODUCTS LIABILITY LITIGATION | ) ) ) | MDL No. 1403 |
| This document is applicable to | ) ) | **DOCKETED** |
| MARVIN KRAMER, et al., | ) ) | JUL 1 2 2002 |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 01 C 4928 |
| AVENTIS CROPSCIENCE USA HOLDING, INC., et al., | ) ) ) | and all other related cases. |
| Defendants. | ) ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

This controversy arises from the discovery of genetically modified corn in various food products. Plaintiffs Marvin Kramer, Mitchell and Claude Corbin, Corbin Farms LLC, Clint Killin, Charles Dupraz, William Furlong, Jemar, Inc., Marvin Luiken, Keith Mudd, Edward Olsen, Gerald Greiger, Verlon Ponto, Jon Untiedt, David Christoffer, Alan Roebke, Mica Schnoebelen, Joseph and Ardene Wirts, Southview Farms, Dennis and Donald Olsen, Gordon Stine, Don Sutter, and Bartt McCormack d/b/a Buford Station Farms allege that defendants Aventis CropScience USA Holdings, Inc. (Aventis) and Garst Seed Company (Garst) disseminated a product that contaminated the entire United States' corn supply, increasing their costs and depressing corn prices. Before us are fifteen separately filed cases, consolidated here for pretrial purposes by the Panel for Multidistrict Litigation. *See* 28 U.S.C. §1407. Plaintiffs have filed a 57-count master second amended consolidated class action complaint,

alleging common law claims for negligence, strict liability, private nuisance, public nuisance and conversion on behalf of a nationwide class of corn farmers against Garst, and on behalf of ten statewide classes against Aventis, as well as statutory claims against Aventis under the Tennessee Consumer Protection Act of 1997, Tenn. Code Ann. §§47-18-101 *et seq.*, and the North Carolina Unfair Trade Practices Act, N.C. Gen. Stat. §75-1.1 (1999). Defendants filed a motion to dismiss, arguing that the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. §§136 *et seq.*, preempts plaintiffs' state law claims, that the economic loss doctrine bars any recovery, and that the complaint fails to state a claim under any of plaintiffs' purported legal theories. For the following reasons, defendants' motion to dismiss is granted in part and denied in part.

## BACKGROUND

Aventis[1] genetically engineered a corn seed to produce a protein known as Cry9C that is toxic to certain insects. The seeds are marketed under the brand name StarLink. Garst is a licensee who produced and distributed StarLink seeds. Aventis applied to register StarLink with the EPA, which is responsible for regulating insecticides under FIFRA, 7 U.S.C. §§136 *et seq.* The EPA noted that Cry9C had several attributes similar to known human allergens, and issued only a limited registration, permitting StarLink use for such purposes as animal feed, ethanol production and seed increase, but prohibiting its use for human consumption. Consequently, segregating it from non-StarLink corn, which was fit for human consumption, became of utmost importance. A little background about normal practices for cultivating,

---

[1] A sequence of related corporate entities was involved in the process of developing, registering and distributing StarLink. Aventis is the sole successor-in-interest with respect to StarLink, and the only named party among them. We will not distinguish between Aventis and its predecessors, and will refer simply to "Aventis."

harvesting and distributing corn demonstrates the extensive steps necessary to prevent StarLink corn from entering the food supply.

Corn replicates by the transfer of pollen from one corn plant to another, including cross-pollination from one breed to another. Once airborne, corn pollen can drift over considerable distances, meaning that different corn varieties within a farm, and from neighboring farms, regularly cross-breed. With few exceptions, there are not procedures in place to segregate types of corn. Different corn breeds within an individual farm are commingled at the harvesting stage. Corn from hundreds of thousands of farms is then further commingled as it is gathered, stored and shipped through a system of local, regional and terminal grain elevators. Elevators, storage and transportation facilities are generally not equipped to test and segregate corn varieties. The commingled corn is then marketed and traded as a fungible commodity.

In light of these general practices in the corn industry, the EPA required special procedures with respect to StarLink. These included mandatory segregation methods to prevent StarLink from commingling with other corn in cultivation, harvesting, handling, storage and transport, and a 660-foot "buffer zone" around StarLink corn crops to prevent cross-pollination with non-StarLink corn plants. The limited registration also made Aventis responsible for ensuring these restrictions were implemented, obligating it (a) to inform farmers of the EPA's requirements for the planting, cultivation and use of StarLink; (b) to instruct farmers growing StarLink how to store and dispose of the StarLink seeds, seed bags, and plant detritus; and (c) to ensure that all farmers purchasing StarLink seeds signed a contract binding them to these terms before permitting them to grow StarLink corn.

StarLink was distributed throughout the United States from approximately May 1998 through October 2000. The limited registration initially limited StarLink cultivation to 120,000 acres. In January 1999, Aventis petitioned the EPA to raise this limit to 2.5 million acres. The EPA agreed, subject to an amended registration that required Aventis to

> (a) inform purchasers (i.e. "Growers") at the time of StarLink seed corn sales, of the need to direct StarLink harvest to domestic feed and industrial non-food uses only;
> (b) require all Growers to sign a "Grower Agreement" outlining field management requirements and stating the limits on StarLink corn use;
> (c) deliver a Grower Guide, restating the provisions stated in the Grower Agreement, with all seed;
> (d) provide all Growers with access to a confidential list of feed outlets and elevators that direct grain to domestic feed and industrial uses;
> (e) write to Growers prior to planting, reminding them of the domestic and industrial use requirements for StarLink corn;
> (f) write to Growers prior to harvest, reminding them of the domestic and industrial use requirements for StarLink corn;
> (g) conduct a statistically sound follow-up survey of Growers following harvest, to monitor compliance with the Grower Agreement.

Over this 29-month period, StarLink cultivation expanded from 10,000 acres to 350,000 acres.

In October 2000, after numerous reports that human food products had tested positive for Cry9C, a wave of manufacturers issued recalls for their corn products. On October 12, 2000, Aventis, at EPA's urging, applied to cancel the limited registration, effective February 20, 2001. Fear of StarLink contamination nonetheless continues to affect corn markets. Many U.S. food producers have stopped using U.S. corn, replacing it with imported corn or corn substitutes. South Korea, Japan and other foreign countries have terminated or substantially limited imports of U.S. corn. Grain elevators and transport providers are now mandating expensive testing on all corn shipments.

Plaintiffs allege that the widespread StarLink contamination of the U.S. corn supply

is a result of defendants' failure to comply with the EPA's requirements. Aventis did not include the EPA-mandated label on some StarLink packages, did not notify, instruct and remind StarLink farmers of the restrictions on StarLink use, proper segregation methods and buffer zone requirements, and did not require StarLink farmers to sign the obligatory contracts. Prior to the 2000 growing season Aventis allegedly instructed its seed representatives that it was unnecessary for them to advise StarLink farmers to segregate their StarLink crop or create buffer zones because Aventis believed the EPA would amend the registration to permit StarLink use for human consumption. In July 2001, however, an EPA Scientific Advisory Panel reaffirmed its previous position on StarLink's allergenic qualities. Further, the FDA has declared StarLink to be an adulterant under the Food, Drug and Cosmetic Act, 21 U.S.C. §§301 *et seq.*

## DISCUSSION

Fed. R. Civ. P. 8(a)(2) only requires "a short and plain statement of the claim showing that the pleader is entitled to relief." When deciding a Rule 12(b)(6) motion we must assume the truth of all well-pleaded factual allegations, making all possible inferences in the plaintiff's favor. Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund, 25 F.3d 417, 420 (7th Cir. 1994). We will dismiss a claim only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

### I. Preemption

FIFRA, 7 U.S.C. §§136 *et seq.*, regulates the use, sale and labeling of pesticides such as the Cry9C protein found in StarLink corn. The EPA approved StarLink's label and issued

a limited registration for it to be distributed. Defendants argue that FIFRA preempts plaintiffs' state law claims.

FIFRA does not preempt all state laws respecting pesticides. <u>Wisconsin Public Intervenor v. Mortier</u>, 501 U.S. 597, 614 (1991). The statute expressly authorizes states to regulate pesticide use. 7 U.S.C. §136v(a). But it also prohibits states from imposing any labeling requirements beyond those imposed by the EPA. 7 U.S.C. §136v(b).

The Supreme Court has made clear that "requirements" includes both positive law, in the form of statutory and regulatory obligations, and any common law standards which could give rise to civil damages. <u>Cippolone v. Liggett Group, Inc.</u>, 505 U.S. 504 (1992) (interpreting preemption clause in Public Health Cigarette Smoking Act of 1969, 15 U.S.C. §§1331-1340). FIFRA uses nearly identical language to the Cigarette Act, and its preemptive effect is equivalent. <u>Shaw v. Dow Brands, Inc.</u>, 994 F.2d 364, 370-71 (7th Cir. 1993).[2] FIFRA therefore preempts any claims based on the inadequacy of StarLink's label or defendants' failure to warn StarLink farmers.

Moreover, plaintiffs cannot avoid preemption by artful pleading. We must scrutinize their allegations to ensure that they are not disguised failure-to-warn claims. *See, e.g.*, <u>Greiner v. Vermont Log Building</u>, 96 F.3d 559, 564 (1st Cir. 1996). If a claim amounts to a constructive challenge to the EPA-approved label, FIFRA preempts it. Courts have, however, recognized certain types of claims as falling outside of FIFRA. *See, e.g.*, <u>Worm v. American Cyanamid Co. (Worm I)</u>, 970 F.2d 1301, 1308 (4th Cir. 1992) (state remedy for failure to comply with EPA

---

[2]To the extent there is any disagreement among the courts of appeals, we are bound by the Seventh Circuit's interpretations of federal law, regardless of where these individual cases may have originated. Our opinion on certain plaintiffs' motions to remand discussed this choice-of-law issue in some detail. *See* <u>In re: StarLink</u>, 2002 WL 743020 (N.D. Ill. April 26, 2002).

requirements); <u>Lowe v. Sporicidin Int'l</u>, 47 F.3d 124, 130 (4th Cir. 1995) (off-label representations inconsistent with the label); <u>New York State Pesticide Coalition v. Jorling</u>, 874 F.2d 115, 119 (2d Cir. 1989) (failure to warn third parties); <u>National Bank of Commerce v. Dow Chemical Co.</u>, 165 F.3d 602, 609 (8th Cir. 1999) (design defects). Portions of the complaint implicate each of these, so we discuss them in turn.

First, plaintiffs allege that defendants sold StarLink seeds without the EPA-required label, and otherwise failed to comply with the limited registration's terms. There is no federal private right of action to redress FIFRA violations. Only the EPA has standing to enforce it. <u>No Spray Coalition, Inc. v. City of New York</u>, 252 F.3d 148, 150 (2d Cir. 2001). FIFRA does not, however, prevent states from creating civil remedies for violating the federal standard. *See, e.g.,* <u>Lowe</u>, 47 F.3d at 128; <u>MacDonald v. Monsanto</u>, 27 F.3d 1021, 1024 (5th Cir. 1994). The statute only prohibits additional requirements, not identical ones. 7 U.S.C. §136v(b). Although potential civil liability obviously increases the manufacturer's incentive to comply, if the state is merely adopting as its standard of care that which is already required under federal law, no additional obligation is imposed.[3] FIFRA, therefore, does not preempt plaintiffs' negligence *per se* claims.

Next, plaintiffs assert that defendants made voluntary statements regarding StarLink beyond those on the EPA-approved label that contributed to the contamination. Claims based on off-label representations are preempted if they merely reiterate information contained in the label. <u>Lowe</u>, 47 F.3d at 130. They are not preempted, however, to the extent the

---

[3] At this point we express no opinion as to whether the ten jurisdictions in question recognize a civil remedy for the FIFRA violations alleged here. The parties have not fully briefed the issue, so we reserve judgment for a later day.

representations substantially differ from the label.  *Id.*[4]  The complaint alleges that Aventis instructed seed representatives to tell farmers that StarLink was safe for human consumption and that the EPA was going to issue a tolerance for Cry9C in food products.  Such statements directly contradict the approved label and therefore fall within <u>Lowe</u>.

Plaintiffs also advance the theory that defendants failed to adequately inform those who handled corn further down the distribution chain, *e.g.*, grain elevator operators and transport providers, of the required warnings.  Courts have noted the distinction between failure to warn the initial purchaser and failure to warn third parties.

> FIFRA "labeling" is designed to be read and followed by the end user. Generally it is conceived as being attached to the immediate container of the product in such a way that it can be expected to remain affixed during the period of use.... By contrast, the target audience of the [state] notification program is those innocent members of the general public who may unwittingly happen upon an area where strong poisons are present, as well as those who contract to have pesticides applied.

<u>New York State Pesticide Coalition</u>, 874 F.2d at 119; *see also* <u>Mortier</u>, 501 U.S. at 603 (upholding regulation requiring placards be posted to notify third parties of pesticide use). Parties who handle StarLink corn down the supply chain will not see the label on the original seed bag and, consequently, will not know that a particular batch of corn is unfit for human consumption and must be segregated and handled differently.  States can reasonably require that pesticide manufacturers share the same EPA-approved warnings with parties beyond the immediate purchaser.  Similar to permitting state causes of action for directly violating FIFRA, because the state standard here would mirror the federal one in substance, it does not

---

[4]We note that two other circuits have held that FIFRA more broadly preempts actions based on off-label statements. <u>Taylor AG Indus. v. Pure-Gro</u>, 54 F.3d 555, 561 (9th Cir. 1995); <u>Pappas v. Upjohn Co.</u>, 985 F.2d 516, 519 (11th Cir. 1993). The Seventh Circuit explicitly declined to take a position on this split. <u>Kuiper v. American Cyanamid Co.</u>, 131 F.3d 656, 662 (7th Cir. 1997). We choose to follow <u>Lowe</u> for the reasons given there.

interfere with the EPA's prerogative with respect to labeling and does not constitute an additional requirement.

Finally, plaintiffs allege that StarLink corn is a defective product. They assert that, as currently designed, StarLink cannot be safely used for its intended non-food purposes because it will inevitably commingle and cross-pollinate with the food supply. The EPA's approval of a product's FIFRA label does not constitute a finding or an endorsement that its design is safe. *See generally* Jeffers v. Wal-Mart Stores, Inc., 171 F. Supp.2d 617, 623-24 (S.D.W. Va. 2001). Here we must be careful to determine whether their allegations are really challenging the product design, which is permissible, or effectively challenging the accompanying warnings, which would be preempted. The test most frequently articulated is, when confronted with a type of harm, would the manufacturer change the design or the label to prevent its recurrence? Worm v. American Cyanamid Co. (Worm II), 5 F.3d 744, 747-48 (4th Cir. 1993).

Defendants' failure to prevent commingling has nothing to do with StarLink's design. Plaintiffs acknowledge that, although it is not the general practice, there are means to segregate types of corn such that they maintain their identity.[5] It is a matter of ensuring that everyone who handles the corn adheres to certain procedures. Confronted with commingling, a manufacturer would more likely change the warnings than the design. This constitutes a failure to warn, not a design defect, and therefore FIFRA preempts it.

The allegations regarding StarLink's tendency to cross-pollinate with non-StarLink corn can be read two ways. One is that defendants should have known that the 660-foot buffer zone was insufficient to prevent cross-pollination. The 660-foot requirement was incorporated

---

[5]At several points the complaint specifically refers to "identity preserved" corn.

in the limited registration and would have been communicated to farmers by the EPA-approved label. A state standard of care demanding more than a 660-foot buffer would be an additional requirement in the form of a different warning. FIFRA preempts such a claim.

It is also possible to view plaintiffs' cross-pollination charge as asserting that no buffer zone could prevent it. The theory posits that, given the way corn reproduces, cross-pollination between corn targeted for non-food uses and corn intended for the human food supply is inevitable. Defendants, therefore, had a duty to design insect-resistant corn such that it is fit for human consumption – use a protein that is safer than Cry9C. This still attacks the label because it is premised on the idea that the buffer zone warning was not sufficient to prevent cross-pollination. The EPA approved the label with the knowledge that StarLink was unfit for human consumption. It deemed the 660-foot buffer zone an adequate warning to preserve the integrity of the food supply. Plaintiffs' defect claims implicitly challenge this warning and are therefore preempted.

In summary, plaintiffs may proceed on the theory that defendants (1) violated duties imposed by the limited registration; (2) made representations to StarLink growers that contradicted the EPA-approved label; and (3) failed to inform parties handling StarLink corn downstream of the EPA-approved warnings.

## II.     Economic Loss Doctrine

This rule limits the types of damages plaintiffs may recover in tort. Physical injuries to persons or property are compensable; solely economic injuries are not. The difficult question is defining what constitutes an "economic" injury.

Although there is some variation at the margins among jurisdictions, they all recognize

the same basic policy.  For example, Illinois defines economic losses as

> damages for inadequate value, costs of repair and replacement of the defective
> product, or consequent loss of profits – without any claim of personal injury or
> damage to other property ... as well as the diminution in the value of the product
> because it is inferior in quality and does not work for the general purposes for
> which it was manufactured and sold.

Moorman Mfg. Co. v. National Tank Co., 435 N.E.2d 443, 449 (Ill. 1982).  Wisconsin, by

comparison, states:

> Economic loss is generally defined as damages resulting from inadequate value
> because the product "is inferior and does not work for the general purposes for
> which it was manufactured and sold."  It includes both direct economic loss and
> consequential economic loss.  The former is loss in value of the product itself;
> the latter is all other economic losses attributable to the product defect.

Daanen & Janssen, 573 N.W.2d at 845 (citations omitted); *see also* Determan v. Johnson, 613

N.W.2d 259, 262 (Iowa 2000); Northwest Ark. Masonry, Inc. v. Summit Specialty Products,

Inc., 31 P.2d 982, 987 (Kan. Ct. App. 2001); Lloyd F. Smith Co. v. Den-Tal-Ez, Inc., 491

N.W.2d 11, 15 (Minn. 1992); Groppel Co. v. United States Gypsum Co., 616 S.W.2d 49, 55 n.5

(Mo. Ct. App. 1981); National Crane Corp. v. Ohio Steel Tube Co., 332 N.W.2d 39, 42 (Neb.

1983); Steiner v. Ford Motor Co., 606 N.W.2d 881, 883 (N.D. 2000); Diamond Surface, Inc. v.

State Cement Plant Comm'n, 582 N.W.2d 155, 161 (S.D. 1998); McCrary v. Kelly Technical

Coatings, Inc., 1985 WL 75663 at *3 (Tenn. Ct. App. 1985).  The recurring theme is that

economic losses are about disappointed commercial expectations.

The classic case involves the purchase of a defective product.[6]  The suit seeks

compensation for the cost of repairing or replacing the product, and profits lost due to the

---

[6]The doctrine has expanded to include most contractually acquired services. But there is consider-
ably less uniformity among jurisdictions, particularly with respect to the growing number of exceptions
courts have carved out, when applied to services.  Because StarLink is a product, however, we need not be
concerned with the nuances of applying the rule to services.

product being out of service. *See, e.g.*, <u>Seeley v. White Motor Co.</u>, 403 P.2d 145 (Cal. 1965) (*en banc*) (lost profits due to defective delivery truck); <u>Rardin v. T & D Machine Handling, Inc.</u>, 890 F.2d 24 (7th Cir. 1989) (broken printing press).  The rule includes a product that is of inferior quality, that fails to work for the general purpose for which it was manufactured, or that does harm to itself – if a product breaks down it is really just another form of the product failing to fulfill its expected performance.  Purchasers who want to insure against these failures are free to negotiate those terms, or they may choose to forego these protections in exchange for a discounted price.  In any event, parties can allocate the risks according to their own preferences.  It is only when the product harms a person, or some property other then the product itself, that tort law provides a remedy.

The doctrine derives its origin from Justice Traynor's opinion in <u>Seeley</u>, *supra*.  The primary policy concerns are:

> (1) to maintain the fundamental distinction between tort law and contract law;
> (2) to protect commercial parties' freedom to allocate economic risk by contract;
> and (3) to encourage the party best situated to assess the risk of economic loss,
> the commercial purchaser, to assume, allocate, or insure against that risk.

<u>Daanen & Janssen</u>, 573 N.W.2d at 846.  In describing the distinction between contract and tort, the Wisconsin court observed: "The law of contracts is designed to effectuate exchanges and to protect the expectancy interest of parties to private bargained-for agreements. ... Tort law is rooted in the concept of protecting society as a whole from physical harm to person or property." *Id.*  Whenever plaintiff's losses can be characterized as failing to receive the benefit of one's bargain, contract (including any warranty or uniform commercial code protections) is the only remedy.

Although the concept is rooted in freedom-of-contract theory, privity of contract is

generally not required. <u>Daanen & Janssen</u>, 573 N.W.2d at 849; <u>Northwest Ark. Masonry</u>, 31 P.2d at 988; <u>Anderson Elec., Inc. v. Ledbetter Erection Corp.</u>, 503 N.E.2d 246, 249 (Ill. 1986).[7] If this were not so, then manufacturers would become liable for economic expectations of secondary purchasers. <u>Daanen & Janssen</u>, 573 N.W.2d at 849. It also extends the rule to litigants who were both involved in a multiparty transaction but did not have any direct contractual relationship. <u>Nigrelli Sys., Inc. v. E.I. DuPont De Nemours and Co.</u>, 31 F. Supp. 1134 (E.D. Wisc. 1999). The fact that plaintiffs had no viable contract remedy did not entitle them to recover in tort. We note, however, that in both scenarios the purchasers had an opportunity to negotiate warranty terms with someone – from the secondary seller or through some form of indemnity arrangement.

Another class of cases where courts typically invoke the economic loss doctrine are the so-called "bridge" cases, or, as we will describe them, "access" cases.[8] In an access case plaintiffs seek compensation for profits lost because the alleged tort prevented customers from reaching their businesses. The paradigm case involves a bridge or road closure. *See, e.g.*, <u>Nebraska Innkeepers, Inc. v. Pittsburgh-Des Moines Corp.</u>, 345 N.W.2d 124 (Iowa 1984) (bridge providing access to plaintiffs' businesses closed due to defective steel); <u>Dundee Cement Co. v. Chemical Lab., Inc.</u>, 712 F.2d 1166 (7th Cir. 1983) (road accessing plaintiff's plant closed due to chemical spill). But the same principle applies any time a business seeks compensation

---

[7] There are cases holding that recovery was not barred because plaintiff had no direct relationship with defendant and, therefore, no opportunity to negotiate contractual protections. *See* <u>Intamin, Inc. v. Figley-Wright Contractors, Inc.</u>, 608 F. Supp. 408, 411 (N.D. Ill. 1985). We note that <u>Anderson Elec.</u>, *supra*, and <u>Chicago Flood</u>, *supra*, both rejected privity as a requirement post-<u>Intamin</u>.

[8] As we discuss below, there are fact patterns involving other means of access, besides bridges, that implicate the same principles. We prefer the more inclusive description, "access" cases, and will use this broader moniker.

for potential customers being unable to access their premises. *See, e.g.,* In re: Chicago Flood Litigation, 680 N.E.2d 265 (Ill. 1997) (flooding to neighboring stores forced merchants whose stores were not physically invaded by water to close).

Although they are nominally under the same economic loss rule, there are really some different policy issues driving the doctrine in access cases. The usual concerns about interfering with contract law and the parties' freedom to allocate risks are not present because there is no contractual relationship. The parties are typically strangers and, with no foreknowledge of each other's activities, had no opportunity to assess and allocate risks *ex ante*. What these cases share in common with traditional economic loss doctrine jurisprudence is the lack of property damage. Moreover, because the only harms alleged were profits lost due to customers' inability to access the premises, these damages fit neatly within the rubric of "disappointed commercial expectations." Courts also emphasize the speculativeness and potential magnitude of damages in access cases. Lost profits are frequently speculative because we cannot predict potential customers' behavior to a sufficient degree of certainty. And the tort's effects on plaintiffs are not qualitatively different from the effects on society at large. In theory, any bridge or road closing affects everyone to some extent by eliminating one potential travel route. Given the unbounded group of potential plaintiffs, damages would be limitless. So, although the original policy bases for the economic loss doctrine are not present, because of the type of injury, these cases seem to fit, at least linguistically, within the economic loss doctrine.

The corollary to the economic loss rule is that it does not bar claims for injuries to other property, or claims alleged in combination with non-economic losses. Daanen & Janssen, 573

N.W.2d at 845. The question then becomes defining "other property." First, plaintiffs cannot

rely on harm to property belonging to other people to show a non-economic injury. They must

have an ownership interest in the property. Northridge Co. v. W.R. Grace & Co., 471 N.W.2d

179, 183 (Wisc. 1991). Second, courts have uniformly held that if a defective part of a product

harms the rest of the product, that does not constitute "other property." The product still

harmed itself, and nothing else. *See* Cooperative Power Ass'n v. Westinghouse Electric Corp.,

493 N.W.2d 661 (N.D. 1992). A majority of courts have gone a step further, holding that if a

product is integrated into a single system, other parts of that system do not constitute "other

property." *See* Rockport Pharmacy, Inc. v. Digital Simplistics, Inc., 53 F.3d 195, 198 (8th Cir.

1995) (Missouri law) (no recovery for lost data because defective part integrated into computer

system); Transport Corp. of Amer. v. IBM Corp., 30 F.3d 953, 957 (8th Cir. 1994) (Minnesota

law) (same); Trans States Airlines v. Pratt & Whitney Canada, Inc., 682 N.E.2d 45, 58 (Ill.

1997) (engine integrated into airplane frame); Northwest Ark. Masonry, 31 P.2d at 987

(cement mix integrated into wall); Midwhey Powder Co. v. Clayton Indus., 460 N.W.2d 426,

429 (Wisc. Ct. App. 1990) (steam generators integrated into turbines). The modern trend is

to focus on *ex ante* expectations. If the damage is of a type that the buyer could have foreseen

resulting from the product failing to perform, it does not constitute harm to other property.

> [T]he distinguishing central feature of economic loss is ... its relation to what the
> product was supposed to accomplish. For example, if a fire alarm fails to work
> and a building burns down, that is "economic loss" even though the building
> was physically harmed; but if the fire is caused by a short circuit in the fire
> alarm itself, that is not economic harm.

Tomka v. Hoechst Celanese Corp., 528 N.W.2d 103, 106 (Iowa 1995), *quoting* Fireman's Fund

Am. Ins. Cos. v. Burns Elec. Security Serv., 417 N.E.2d 131, 133 (Ill. App. 1st Dist. 1981); *see*

*also* <u>Dakota Gasification Co. v. Pascoe Bldg. Sys.</u>, 91 F.3d 1094, 1099 (8th Cir.1996) (North Dakota law); <u>Trinity Indus., Inc. v. McKinnon Bridge Co.</u>, 2001 WL 1504827 at *21 n.1 (Tenn. Ct. App. Nov. 28, 2001), *appeal denied* (Apr. 29, 2002). Minnesota has gone the furthest, holding that merchants cannot recover in tort for any property damage caused by the defective product. <u>Hapka v. Paquin Farms</u>, 458 N.W.2d 683, 688 (Minn.1990).[9]

Non-StarLink corn crops are damaged when they are pollinated by StarLink corn. The pollen causes these corn plants to develop the Cry9C protein and renders what would otherwise be a valuable food crop unfit for human consumption. Non-StarLink corn is also damaged when it is commingled with StarLink corn. Once mixed, there is no way to re-segregate the corn into its edible and inedible parts. The entire batch is considered tainted and can only be used for the domestic and industrial purposes for which StarLink is approved. None of that supply can ever be used for human food.

There are at least four different points along the supply chain at which StarLink could have entered the food corn supply, all of which are consistent with the complaint: (1) plaintiffs unknowingly purchased seed containing the Cry9C protein, *i.e.* their suppliers' inventory had been contaminated; (2) plaintiffs' crops were contaminated by pollen from StarLink corn on a neighboring farm; (3) plaintiffs' harvest was contaminated by commingling with StarLink corn in a transport or storage facility; and (4) food manufacturers commingled the corn within their raw material storage or processing activities.[10] The first situation would fall within the

---

[9]Although merchants' only remedy for property damage is the U.C.C., other types of buyers can still recover for harm to other property, and merchants can recover for personal injuries. *Id.*

[10]We note that defendants continually characterize the complaint as alleging that "the entire corn farming and production chain" was contaminated, not that plaintiffs' corn was directly harmed. Resolving the complaint's ambiguous phraseology in plaintiffs' favor, we find that they have sufficiently alleged that their crops were contaminated at some point within that chain.

economic loss doctrine. Plaintiffs could have negotiated contractual protection from their suppliers and simply did not get what they had bargained for. In the fourth, plaintiffs would have suffered no harm to their property because the corn was commingled after they had relinquished their ownership interest in it. Scenarios 2 and 3, however, present viable claims for harm to their crops.

The StarLink situation does not fit neatly into traditional economic loss doctrine analysis. Plaintiffs here had no commercial dealings with defendants or defendants' customers. This is more than a lack of direct privity, and not a situation where a party could have negotiated warranty or indemnity protection and chose not to. Plaintiffs had no opportunity to negotiate contractual protection with anyone. Still, as the access cases aptly demonstrate, the economic loss doctrine has grown beyond its original freedom-of-contract based policy justifications. Farmers' expectations of what they will receive for their crops are just that, expectations. Absent a physical injury, plaintiffs cannot recover for drops in market prices. Nor can they recover for any additional costs, such as testing procedures, imposed by the marketplace. But if there was some physical harm to plaintiffs' corn crop,[11] the lack of a transaction with defendants affects what will be considered "other property." Assuming plaintiffs did not buy corn seeds with the Cry9C protein, it cannot be said that a defective part of their crop injured the whole, that a defective product was integrated into a system or that the harm to their crop was a foreseeable consequence of the seeds' failure to perform. These facts are distinguishable from Hapka, 458 N.W.2d at 688 (holding farmer who purchased

---

[11]This includes corn commingled at grain elevators because plaintiffs retain ownership rights to corn stored there. Each contributing farmer owns a pro rata share of the entire, now tainted, supply. *See generally*, Missouri v. United States Bankr. Ct. of E.D. Ark., 647 F.2d 768, 775 n.13 (8th Cir. 1981).

diseased seeds could not recover for harm to rest of crop). Plaintiffs' seeds, as purchased, were adequate. The StarLink contaminant was wholly external.

Nor does the StarLink controversy present the unlimited or speculative damage concerns common in access cases. There are a finite number of potential plaintiffs – only non-StarLink corn farmers – who can claim injury. This may be a sizeable group, and the damages may be tremendous, but the fact that defendants are alleged to have directly harmed a large number of plaintiffs is not a defense. StarLink's effects on commercial corn farmers are distinct and qualitatively different from society at large. And damages are easily measured through price changes because corn is a regularly traded commodity with a readily measurable market. Further, as discussed above, the contamination of plaintiffs' corn supply is a physical injury.

To the extent plaintiffs allege that their crops were themselves contaminated, either by cross-pollination in the fields or by commingling later in the distribution chain, they have adequately stated a claim for harm to property. Once plaintiffs have established this harm they may be entitled to compensation for certain economic losses. *See, e.g.,* Schlitz v. Cullen-Schlitz & Assoc., 228 N.W.2d 10, 21 (Iowa 1975) (holding plaintiff who established tangible harm may also recover cleanup costs because they are an integral part of direct property damage); Dundee Cement Co., 713 F.2d at 1170 (noting recovery of lost profits permitted where plaintiff's property was physically injured). But we caution that proving direct harm to their own property is a predicate to any recovery. We leave for another day the question of what, if any, consequential damages they may also collect, and now turn to the substance of plaintiffs' claims.

### III.    Negligence

Defendants challenge three separate elements: duty, proximate cause and damages. Although cast in terms of a balance between foreseeability, reasonableness and public policy, the essence of their argument is remoteness – any effect StarLink may have had on corn markets is too far removed from defendants' conduct.  Defendants contend that the causal relationship involved six distinct steps: (1) the EPA approved the registration for Cry9C; (2) seed companies incorporated the StarLink technology into seed corn; (3) growers purchased StarLink seeds; (4) the StarLink seeds/corn was handled in such a way as to allow cross-pollination and commingling; (5) the tainted corn was introduced into the mainstream corn supply, leading to food product recalls; and (6) the discovery of StarLink in the main food supply hurt corn prices.

In presenting their version of the causal chain, however, defendants have imposed their own construction on the complaint.  On a motion to dismiss we must not only accept plaintiffs' version, but also any set of facts consistent with it.  First, defendants' argument used their own characterization of Aventis' role, or lack thereof, in bringing StarLink to market.  Aventis denies any involvement in numerous steps leading to the widespread StarLink contamination. This is a simple factual dispute.  The complaint plainly alleges that Aventis (or its predecessors) were involved in developing and licensing StarLink.  Moreover, it alleges that pursuant to the limited registration Aventis was responsible for monitoring and enforcing compliance by StarLink farmers.  For now we must accept plaintiffs' version of Aventis' involvement in introducing StarLink into the food supply.

We must also collapse defendants' purported chain from the other end.  Although they

attempt to characterize the complaint as asserting some remote duty to preserve the market price of corn, the duty alleged is to prevent contamination. The effects on corn markets are merely a way to measure the damages. As we discussed above, we read the complaint to allege direct harm to plaintiffs' corn. Defendants are correct that the complaint does not make this charge specifically, but it is a set of facts that is consistent with plaintiffs' allegations about the impact on the corn system as a whole. At this stage of litigation we must construe this ambiguity in plaintiffs' favor.

Presuming Aventis' more active involvement with StarLink, and presuming further that the latter physically harmed plaintiffs' corn, the chain becomes substantially shorter. Aventis had a duty to ensure that StarLink did not enter the human food supply, and their failure to do so caused plaintiffs' corn to be contaminated.

Lastly, Aventis argues that even if plaintiffs suffered direct harm to their corn, its SES program would fully compensate them. Plaintiffs have alleged otherwise, and for now, that is sufficient.

IV.    Conversion

Conversion is defined as "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Restatement (Second) of Torts §222A. Plaintiffs argue that defendants' role in contaminating the corn supply amounts to a conversion of their property. We disagree.

The defining element of conversion, the one that distinguishes it from a trespass to chattels, is the extent of interference with the owner's property rights. If the damage is minor,

in duration or severity, plaintiff may only recover for the diminished value. But if the damage is sufficiently severe, plaintiff may recover full value. Conversion is akin to a forced judicial sale. The defendant pays full value for the chattel, and receives title to it. Restatement §222A comment c. Here, plaintiffs have not alleged that defendants destroyed their crops or deprived them of possession. Plaintiffs retained possession and still had total control over the corn. Most, if not all of it, was ultimately sold to third parties. The only damages were a lower price, for which plaintiffs could be compensated without forcing a sale.

It is possible to convert a chattel by altering it, without completely destroying it. In particular, commingling fungible goods so that their identity is lost can constitute a conversion. Restatement §226 comment e. To do so, however, the perpetrator must alter the chattel in a way that is "so material as to change the identity of the chattel or its essential character." Restatement §226 comment d. At worst, StarLink contamination changed plaintiffs' yield from being corn fit for human consumption to corn fit only for domestic or industrial use. Plaintiffs do not claim they were growing the corn to eat themselves, but for sale on the commodity markets. The crops were still viable for the purpose for which plaintiffs would normally use them, for sale on the open market. That the market had become less hospitable does not change the product's essential character. As above, the severity of the alteration is indicated by the decrease in market price. This could arguably constitute a trespass to chattels, but does not rise to the level of conversion.

Lastly, negligence cannot support a conversion claim. It requires intent. Restatement §224. The complaint alleges that defendants did not take adequate precautions to ensure that StarLink corn was adequately segregated. Nowhere do plaintiffs claim that defendants

intentionally commingled StarLink and non-StarLink corn, or deliberately contaminated the food supply. Even if defendants negligently failed to prevent cross-pollination and commingling, they would not be liable for conversion.

V.    Nuisance

    A.    Private

The complaint alleges that defendants created a private nuisance by distributing corn seeds with the Cry9C protein, knowing that they would cross-pollinate with neighboring corn crops.[12] "A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land." Restatement (Second) of Torts §821D. We agree that drifting pollen can constitute an invasion, and that contaminating neighbors' crops interferes with their enjoyment of the land. The issue is whether defendants are responsible for contamination caused by their product beyond the point of sale.

Defendants argue that they cannot be liable for any nuisance caused by StarLink because they were no longer in control of the seeds once they were sold to farmers. But one can be liable for nuisance "not only when he carries on the activity but also when he participates to a substantial extent in carrying it on." Restatement §834. Plaintiffs maintain that defendants' design of the StarLink technology, distribution of the seeds and, most importantly, their failure to fulfill their EPA-mandated duties, constitutes substantial participation.

The paradigm private nuisance case involves a suit between two neighboring

---

[12]The private nuisance claims appear to be premised exclusively on cross-pollination in the fields, not commingling later in the distribution chain. Commingling could not constitute a private nuisance because it does not involve an invasion of any private interests in land. By contrast, the public nuisance claims, discussed below, may be premised on commingling because "[u]nlike a private nuisance, a public nuisance does not necessarily involve interference with use or enjoyment of land." Restatement §821B comment h.

landowners, one of whom alleges that the other's activities are somehow interfering with the first's enjoyment of the land. Suing the manufacturer of the product that the neighbor was using appears to be an extension of nuisance law into an area normally regulated by product liability. But there is precedent for such an application under certain circumstances, and it does fit within the definition of a nuisance.

Looking first at state law from the jurisdictions in question, we find that three have stretched nuisance liability particularly broadly. A Wisconsin court has gone so far as holding that a purchaser can state a nuisance claim directly against a manufacturer. Northridge Co. v. W.R. Grace & Co., 556 N.W.2d 345 (Wisc. Ct. App. 1996) (finding asbestos constituted a nuisance). Applying the longstanding rule that "one who has erected a nuisance will be responsible for its continuance, even after he has parted with the title and the possession," Lohmiller v. Indian Ford Water-Power Co., 8 N.W. 601, 602 (Wisc. 1881), the court held that "manufacturers can be liable for a nuisance long after they relinquish ownership or control over their polluting products." Northridge, 556 N.W.2d at 352.

An Illinois court has also taken a broad view of nuisance, sustaining a public nuisance claim against gun manufacturers. Young v. Bryco Arms, 765 N.E.2d 1 (Ill. App. 1st Dist. 2001). The court relied extensively on language in a gun case from this district, Bubalo v. Navegar, Inc., 1998 WL 142359 (N.D. Ill. Mar. 20, 1998).[13] Both cases emphasized that plaintiffs had alleged malfeasance on the part of the manufacturers, in the form of intentionally marketing their products to appeal to criminals. Id. at *4; Young, 765 N.E.2d at 14. In doing so, they distinguished a Seventh Circuit case holding a chemical manufacturer not liable for chemicals

_____

[13]Bubalo, decided nearly four years before Young, ultimately dismissed the nuisance claim out of reluctance to recognize a new theory of liability without any state decisional precedent. Id. at *5

released from a customer's facility because "[t]he uncontested record shows that when alerted

to the risks associated with [the chemicals], [the manufacturer] made every effort to have [the

customer] dispose of the chemicals safely."  City of Bloomington v. Westinghouse Electric

Corp., 891 F.2d 611, 614 (7th Cir. 1989) (Indiana law), *quoted in* Bubalo, 1998 WL 142359 at

*4 n.2.  Bubalo posited:

> Suppose, however, that [the manufacturer] had not taken steps to alert
> customers of the risks of the product, or intentionally marketed the product to
> customers who it knew or should have known would dispose of [it] in a manner
> that would harm the environment.   Nothing in the opinion in City of
> Bloomington would preclude the imposition of liability on the manufacturer
> under those facts.

1998 WL 142359 at *4, *quoted in* Young, 765 N.E.2d at 14.  In sustaining the nuisance claim

the Illinois court found that the allegation of wrongdoing by the manufacturer "suggested a

degree of participation not present in City of Bloomington and 'within the meaning of [the]

phrase ['to a substantial extent'] in the Restatement §834."  Young, 765 N.E.2d at 14 (edits in

original, citations omitted).

     Most analogous to the case at bar, in Page County Appliance Center, Inc. v. Honeywell,

Inc., 347 N.W.2d 171, 177 (Iowa 1984), the Iowa Supreme Court explicitly rejected an

argument identical to the one raised by defendants here.  Plaintiff there alleged that radiation

emanating from a neighbor's computer, manufactured by defendant, was affecting appliances

in its store.  Defendant maintained that it could not be liable for the nuisance because it had

sold the computer to the neighbor and was no longer in control of the instrument.  The court

noted that the manufacturer had an ongoing contract to service and maintain the computer

and, therefore, arguably had the ability to abate the nuisance.  Relying on Restatement §834,

the court rejected defendant's lack-of-control argument, holding that "[the manufacturer's]

material participation was a question of fact." *Id.*

Defendants point to a number of cases rejecting similar nuisance claims, particularly asbestos and gun cases. None is an authoritative state decision from the jurisdictions involved here.[14] There are three federal cases interpreting relevant states' law, but they are all asbestos cases, which we distinguish below, and in jurisdictions where the state courts have not considered the central question of whether a manufacturer can be liable for a nuisance caused by its product beyond the point of sale. *See* Tioga Public School Dist. No. 15 v. United States Gypsum Co., 984 F.2d 915, 920 (8th Cir. 1993); Appletree Square 1 Ltd. v. W.R. Grace & Co., 815 F. Supp. 1266, 1274 n.13 (D. Minn. 1993); County of Johnson v. United States Gypsum Co., 580 F. Supp. 284, 294 (E.D. Tenn. 1983).[15]

This brings us to the case at bar, which is much closer to mainstream nuisance doctrine than either the asbestos or gun cases. In the asbestos cases, the plaintiffs had themselves purchased the product, consented to having it installed on their property and then sued the manufacturer when it turned out to be harmful. There was no invasion of a neighboring property and plaintiffs had exclusive access to the nuisance-causing agent. Here, plaintiffs did not purchase StarLink seeds, and have alleged that pollen from neighboring farms did enter

---

[14]Other states have rejected nuisance claims against asbestos manufacturers on the merits, reasoning that once the product is sold, the manufacturer has no access to the product to control it or abate the nuisance. *See, e.g.,* Detroit Bd. of Ed. v. Celotex Corp., 493 N.W.2d 513, 522 (Mich. Ct. App. 1992).

[15]Of these three cases, only Tioga Public School Dist. contains any substantial discussion of this point, and it mostly reflects the federal court's unwillingness to make new state law. 984 F.2d at 920 ("[Plaintiff] has not presented us with any North Dakota cases extending the application of the nuisance statute to situations where one party has sold to the other a product that later is alleged to constitute a nuisance, nor has our research disclosed any such cases."). Appletree Square and County of Johnson both make only cursory reference to this issue.

their premises.[16] Aside from the presence of an invasion, the fact that the alleged nuisance occurred on another's property means that, unlike asbestos purchasers, plaintiffs had no ability to access or control the nuisance themselves. In the gun cases, manufacturers successfully argued that they should not be held responsible for third parties' intentional misuse of their products. Here, however, plaintiffs have not alleged that StarLink farmers defied the manufacturers' instructions, but rather that the instructions themselves violated the EPA's mandates. Moreover, the gun cases alleged a public nuisance and did not implicate plaintiffs' ability to enjoy land or anyone's unreasonable use of land. Private nuisance jurisprudence has always focused on the use and enjoyment of land. *See generally*, City of St. Louis v. Varahi, Inc., 39 S.W.3d 531, 536 (Mo. Ct. App. 2001). Plaintiffs here have alleged that they are unable to enjoy the profits of their land (selling food corn), because of an unreasonable activity on neighboring land (growing StarLink corn).

Another critical factor here is the impact of the limited registration, which negates many of the concerns courts have expressed about holding manufacturers liable for post-sale nuisances. For example, they emphasized that the manufacturers did not have any control over how the purchasers had used their products, or any access to abate the nuisance. *See* Detroit Bd. of Ed., *supra*. Aventis, on the other hand, had an affirmative duty to enforce StarLink farmers' compliance with the Grower Agreements. This arguably gave Aventis some measure of control over StarLink's use, as well as a means to abate any nuisance caused by its misuse. This mirrors Page County Appliance Center, *supra*, where the court found the

---

[16]More analogous to the present posture would be landowners who alleged that asbestos had drifted over property lines from a neighboring building and contaminated their air. We are not aware of any reported cases addressing a nuisance claim under that fact pattern.

### B.     Public

Plaintiffs also assert that StarLink's contamination of the general food corn supply constitutes a public nuisance. Beyond defendants' argument that they lacked control over the alleged nuisance, discussed above, they assert that plaintiffs cannot establish special harm. At the outset, we note the limited depth of review courts typically undertake on a motion to dismiss a public nuisance claim. "The pleading requirements are not strenuous because the 'concept of common law public nuisance elude[s] precise definition.' ... The unreasonableness of the defendant's actions and the substantialness of the right invasion, which lead to the determination of nuisance, are questions of fact for the jury." Gilmore v. Stanmar, Inc., 633 N.E.2d 985, 993 (Ill. App. 1st Dist. 1994) (citations omitted).

To state a claim, plaintiffs must allege "an unreasonable interference with a right common to the general public." Restatement §821B(1). The Restatement sweeps broadly in defining a "public right," including "the public health, the public safety, the public peace, the public comfort or the public convenience." Restatement §821B(2)(a). Contamination of the food supply implicates health, safety, comfort and convenience, and certainly satisfies this permissive standard.

To state a private action for public nuisance, plaintiffs must also demonstrate that they have been harmed differently than the general public. Restatement §821C. The harm must be of a different type, not merely a difference in severity or imposing a disproportionate share of the burden on plaintiffs. Among the Restatement's specific examples are physical harm to chattels, §821C comment d, and pecuniary loss to businesses, §821C comment h. Both are present here.

The closest analogy and most pertinent discussion is in Burgess v. M/V Tamano, 370

manufacturer's ongoing service contract with the purchaser gave defendant enough access and control to create a question of fact as to its contribution to the nuisance. Aventis' duties under the limited registration were, by comparison, even more extensive. Similarly, defendants' failure to give StarLink farmers the warnings mandated by the limited registration, and (ultimately incorrect) representations that StarLink need not be segregated because the EPA was going to approve it for human consumption, are also arguably the type of culpable conduct relied upon in Young, 765 N.E.2d at 14.

In summary, of the states involved here Iowa, Wisconsin and Illinois have all held a manufacturer liable for a nuisance related to its product beyond the point of sale. *See* Page County Appliance Center, *supra*, Northridge, *supra*, Young, *supra*. Federal courts applying Minnesota, North Dakota and Tennessee law have declined to do so without any substantial discussion of the merits. *See* Tioga Public School Dist., *supra*; Appletree Square, *supra*; County of Johnson, *supra*. We have found no cases on point from Kansas, Missouri, Nebraska or South Dakota. The lack of state precedent matching these precise facts does not preclude us from applying widely accepted Restatement law to new factual situations. Residue from a product drifting across property lines presents a typical nuisance claim. All parties who substantially contribute to the nuisance are liable. The unique obligations imposed by the limited registration arguably put Aventis in a position to control the nuisance. On a motion to dismiss we may not speculate whether the as yet undeveloped facts will constitute substantial contribution. To the extent the allegations comport with our preemption analysis above, they do state a valid claim for private nuisance.

F. Supp. 247, 250 (D. Me. 1973). There, commercial fisherman alleged that an oil spill harmed local waters and marine life. The court found that although fishing the waters was a right of the general public, it affected commercial fishermen differently because they depended on it for their livelihood. This was consistent with "the general principle that pecuniary loss to the plaintiff will be regarded as different in kind 'where the plaintiff has an established business making commercial use of the public right with which the defendant interferes ....'" *Id.*, *quoting* Prosser, <u>Law of Torts</u>, §88 at 590 (4th ed. 1971). Here, plaintiffs are commercial corn farmers. While the general public has a right to safe food, plaintiffs depend on the integrity of the corn supply for their livelihood.

Defendants maintain that because plaintiffs purport to represent a group so numerous as a nationwide class of corn farmers, their damages cannot be considered special or unique. But the special damages requirement does not limit the absolute number of parties affected so much as it restricts the types of harm that are compensable. Class actions and special damages are not mutually exclusive. *See, e.g.,* <u>Burgess</u>, 370 F. Supp. 251 (sustaining public nuisance claims by two classes and dismissing a third based on the types of harm alleged). Commercial corn farmers, as a group, are affected differently than the general public.

## VI.     <u>North Carolina Unfair Trade Practices Act</u>

Plaintiffs next allege that Aventis' handling of StarLink violated the NCUTPA, N.C. Gen. Stat. §75-1.1. Like many other states, the North Carolina legislature left the definition of deceptive trade practices purposefully vague, with the intention that courts construe it broadly. <u>Johnson v. Phoenix</u>, 266 S.E.2d 610, 620 (N.C. 1980). The dispute here, however, is not over whether any particular practice is illegal under the statute, but the statute's

geographic reach.  None of the named plaintiffs is from North Carolina.  Nor does the complaint allege that any of them conduct business in North Carolina.  Although the proposed nationwide class would certainly include North Carolina residents, it is axiomatic that the named plaintiffs must show personal injuries to state a claim and cannot rely on harm to unnamed class members.  <u>Lewis v. Casey</u>, 518 U.S. 343, 357 (1996).

Defendants argue that the North Carolina statute only applies to in-state harms.  To apply the statute extraterritorially, they contend, would offend the federal Constitution's due process and full faith and credit clauses.  Plaintiffs, on the other hand, characterize this as nothing more than a choice-of-law problem.  Because Aventis is headquartered in North Carolina, they reason, the unfair practices are likely centered there.  Applying the "most significant relationship" rule, North Carolina's trade practice law should apply.[17]  So long as the conduct affects North Carolina commerce at all, plaintiffs maintain, even out-of-state injuries are compensable.  These positions oversimplify matters.  It is possible for a state to constitutionally regulate in-state conduct that has out-of-state effects.  *See, e.g.,* <u>Avery v. State Farm Mutual Automobile Ins. Co.</u>, 746 N.E.2d 1242, 1254-55 (Ill. App. 5th Dist. 2001).  The question is whether the NCUTPA does so.  On the other hand, even if conflicts rules would choose North Carolina law, whether plaintiffs have stated a claim under the North Carolina statute is a separate issue.  So, before tackling any constitutional or choice-of-law problem, we

---

[17]It is not entirely clear which choice-of-law rule North Carolina courts would apply.  The federal courts that have considered the question have reached different results.  *See, e.g.,* <u>Santana, Inc. v. Levi Strauss & Co.</u>, 674 F.2d 269, 273-74 (4th Cir. 1982) (applying most significant relationship); <u>United Dominion Industries, Inc. v. Overhead Door Corp.</u>, 762 F. Supp. 126, 128-29 (W.D.N.C. 1991) (collecting cases and applying *lex loci dilecti*).  For that matter, we would not necessarily apply North Carolina's choice-of-law rules to the present case.  Rather, we would apply the choice-of-law rules of the ten states in which the transferor courts are situated, which diverge considerably.  Because our interpretation of the statute resolves the question before us, however, we will not address the choice-of-law question.

examine the statute itself.

The NCUTPA states, in relevant part:, "(a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful. (b) For purposes of this section, 'commerce' includes all business activities, however denominated." N.C. Gen. Stat. §75-1.1. This language reflects a 1977 amendment that removed the phrase "within this state," leaving the text without any geographic limitations. North Carolina courts have addressed neither the impact of this amendment, nor the NCUTPA's extraterritorial reach in general. Looking to local federal courts' interpretations, we find two distinct characterizations. The amendment extended the statute "to the limits of North Carolina's long-arm statute," Broussard v. Meineke Discount Muffler Shops, Inc., 945 F. Supp. 901, 917 (W.D.N.C. 1996), or "to the full extent permissible under conflicts of law principles and the Constitution." Hardee's Food Sys., Inc., v. Beardmore, 1997 U.S. Dist. LEXIS 9671 at *7 (E.D.N.C. June 6, 1997). This disparity has led, in turn, to disagreement about whether the statute requires an in-state injury. See, e.g., 'In' Porters, S.A. v. Hanes Printables, Inc., 663 F.Supp. 494, 501 (M.D.N.C. 1987) (requiring substantial effect on in-state business operations); Hardee's Food Sys., Inc., v. Beardmore, 1997 U.S. Dist. LEXIS 9671 at *8-9 (E.D.N.C. June 6, 1997) (no in-state injury requirement).

Plaintiffs, relying on Hardee's, argue that 'In' Porters is no longer good law. In fact, Hardee's is the only opinion we have found that rejects 'In' Porters' reasoning, whereas several other decisions have expressly endorsed it. See, e.g., Broussard, 945 F. Supp. at 917; Merck & Co. v. Lyon, 941 F. Supp. 1443, 1463 (M.D.N.C. 1996); Dixie Yarns, Inc. v. Plantation Knits, Inc., 1994 WL 910955 at *2-3 (W.D.N.C. July 12, 1994). Because these are co-equal

district courts (interpreting state law), we consider them each as persuasive authority. Notably, the only court outside of North Carolina to consider this issue relied on 'In' Porters, and it did so after Hardee's. *See* Lithuanian Commerce Corp. v. Sara Lee Hosiery, 47 F. Supp.2d 523, 537 (D.N.J. 1999).

In construing this statute, the 'In' Porters court looked to external sources. First, it sought to harmonize the NCUTPA with North Carolina's long-arm statute, N.C. Gen. Stat. §1-75.4(4), which allows personal jurisdiction in cases involving foreign acts only if an injury occurs within North Carolina and the party was in, or had products in, North Carolina commerce at the time. 663 F. Supp. at 501. Second, it looked to the standards for applying the federal Sherman Act extraterritorially, which require that the foreign acts have a substantial effect on plaintiff's domestic operations. *Id.*, *citing* Rose v. Vulcan Materials Co., 194 S.E.2d 521 (N.C. 1973) (Sherman Act decisions instructive in determining the full reach of North Carolina's unfair trade act). Both analogies suggested that plaintiffs must establish a substantial effect on in-state operations – an in-state injury – to state a NCUTPA claim. Moreover, the court noted, such an interpretation was consistent with constitutional due process and commerce clause concerns.

The Hardee's court found the text's lack of any geographic restraints controlling. It noted other cases sustaining NCUDTA claims, where plaintiffs had minimal North Carolina operations. 1997 U.S. Dist. LEXIS 9671 at *8-9, *citing* Jacobs, 891 F. Supp. at 1111-12 (allowing suit by out-of-state franchisees against North Carolina franchiser) and Broussard, 945 F. Supp. at 917-18 (sustaining action against North Carolina trucking company by plaintiffs from several different states). And it found the additional profits defendants

achieved by engaging in the alleged practices were a sufficient impact on local commerce.

We believe 'In' Porters reflects the better interpretation. North Carolina courts have found that "the purpose of G.S. 75-1.1 is to provide a civil means to maintain ethical business standards of dealings between persons engaged in business and the consuming public *within this state*," United Virginia Bank v. Air-lift Assoc., 339 S.E.2d 90, 93 (N.C. App. 1986), *quoted in* 'In' Porters, 663 F. Supp. at 502 (emphasis in 'In' Porters). It was designed to address "primarily local concerns." ITCO Corp. v. Michelin Tire Corp., 722 F.2d 42, 48 n.9 (4th Cir. 1983). Plaintiffs point out that Illinois courts have found that the state had an interest in regulating the conduct of local businesses, even as to foreign consumers, and permitted out-of-state consumers to invoke Illinois' consumer protection statute. Avery, 746 N.E.2d at 1255. North Carolina courts have not ascribed such an intention to their legislature. Instead of emphasizing defendants' conduct, they have found that the statute focuses on "the impact the practice has on the marketplace." Marshall v. Miller, 276 S.E.2d 397, 403 (N.C. 1981). The relevant marketplace is North Carolina. Plaintiffs also point out that the NCUTPA does not require contractual privity. Although this is true, courts have frequently cited a direct contractual relationship with an in-state party as the nexus justifying their application of their local statute to that out-of-state plaintiff. *See* Jacobs, 891 F. Supp. at 1111; Broussard, 945 F. Supp. at 917-18. Plaintiffs here have alleged no such contact with any North Carolinian.

If, as Hardee's found, incremental profits by an in-state defendant alone were sufficient effect on in-state commerce to trigger the statute, that would dramatically extend its reach.

> Were that the case, every product manufactured and sold, directly or indirectly, in North Carolina to foreigners which later turn out to be defective would create an unfair competition cause of action whether or not the injured party had ever directed its commercial efforts toward, or even set foot in this state.

<u>Dixie Yarns</u>, 1994 WL 910955 at *2.  We also note that the two cases the <u>Hardee's</u> court primarily relied upon both applied the <u>'In' Porters</u> standard, emphasized the continuing contact plaintiffs had with North Carolina, and made express findings of in-state harm. <u>Jacobs</u>, 891 F. Supp. at 1111; <u>Broussard</u>, 945 F. Supp. at 917-18.

Following <u>'In' Porters'</u> use of the long-arm analogy, we examine whether plaintiffs' contact with North Carolina would sustain personal jurisdiction there.  The answer is decidedly no.  Plaintiffs have not pled any contact with North Carolina.  They have not alleged that they buy or sell any goods there, have any contact with a North Carolina company, or engage in any North Carolina commerce whatsoever.  Because the named plaintiffs have not alleged that they experienced any harm within North Carolina, they cannot state a claim under the NCUTPA.

VII.    <u>Tennessee Consumer Protection Act</u>

Plaintiff McCormack adds an additional claim under the TCPA, T.C.A. §§47-18-101 *et seq.*, alleging that Aventis engaged in deceptive trade practices.  Defendants assert that this claim must be dismissed because McCormack does not allege he had any consumer transaction with Aventis.

The CPA is worded broadly:

> Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive practice declared to be unlawful by this part, may bring an action individually to recover actual damages.

T.C.A. §47-18-109(a)(1).  Nothing in its text requires privity or restricts relief solely to direct purchasers.

Aventis' licensing of its StarLink process to seed growers brings it within the statute. It is well settled that the TCPA applies to sales to corporate entities, as well as to consumers. ATS Southeast, Inc. v. Carrier Corp., 18 S.W.3d 626, 626 (Tenn. 2000). We see no reason to treat selling (or licensing) intellectual property any differently from selling (or leasing) a tangible item. In defining "consumer," the statute specifically refers to one who acquires "tangible or intangible" property. T.C.A. 47-18-103 (2). Moreover, at least one court has sustained a claim where the product in question was an intangible: copyrighted music. *See* Bridgeport Music, Inc. v. 11C Music, 154 F. Supp.2d 1330 (M.D. Tenn. 2001).

Aventis offers two state court cases as standing for the proposition that a plaintiff must have been party to a consumer transaction with a defendant to bring a TCPA claim. In Messer Griesheim Indus. v. Cryotech of Kingsport, Inc., 45 S.W.3d 588, 610 (Tenn. Ct. App. 2001), the court dismissed a claim against a party who was merely the financing lessor and did not offer a product for sale or distribution. And in State *ex rel.* Pierotti v. Sundquist, 1993 WL 166938 at *5 (Tenn. Ct. App. May 19, 1993), the court held that plaintiffs, who had a contractual relationship with a corporation, did not have standing to bring TCPA claim against the corporation's directors because there was no consumer relationship. But we find these distinguishable because neither relied on the fact the defendant did not sell something directly to the plaintiff. As a financing lessor and a corporate director, respectively, those defendants did not sell anything to anyone.

Bridgeport Music, *supra*, dispels the idea that the TCPA requires a direct transaction between the litigants. Plaintiff copyright holders alleged that defendants sold music to consumers as original, when in fact it infringed on plaintiffs' works. There was no contractual

relationship between the litigating parties, but plaintiffs alleged their property rights were harmed by defendants' sales to third parties. The court found this was sufficient to state a TCPA claim and rejected an argument identical to defendants' here.

> [Defendants] insist that Plaintiffs were not *themselves* purchasing goods and therefore cannot sue under the Act. This gloss on the statute is evidently of the Defendants' own creation. The TCPA was amended precisely to expand the class of potential plaintiffs, making relief available to "the consumer *or other person*." T.C.A. 47-18-109(a)(4). The disjunctive added in 1989 precludes any reading that imposes a "buying requirement" upon the plaintiff.

Bridgeport Music, 154, F. Supp.2d at 1333 (emphasis in Bridgeport Music). *See also* Olin Corp. v. Lambda Electronics, Inc., 39 F. Supp.2d 912, 914 (E.D. Tenn. 1998) ("There is no authority that a "consumer transaction" is a *sine qua non* of TCPA applicability."). We agree with Bridgeport Music that the TCPA permits third parties to bring a claim if they are harmed by defendants' deceptive practices.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted with respect to the claims for conversion and violations of the NCUTPA. The motion is denied with respect to the claims for negligence *per se*, public nuisance, private nuisance and violations of the TCPA. The negligence and strict liability claims are dismissed to the extent they rely on a failure to warn, but may proceed under the theories outlined above.

JAMES B. MORAN
Senior Judge, U. S. District Court

July 11, 2002.